FILED & ENTERED

JUL 16 2019

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY wesley    DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>Michael Joel Kamen,<br><br>Debtor(s). | CHAPTER 7<br><br>Case No.:  2:12-bk-19793-BB<br>Adv No:  2:12-ap-01805-BB<br><br>**MEMORANDUM DECISION BARRING DEBTOR'S DISCHARGE PURSUANT TO BANKRUPTCY CODE SECTION 727(a)(4)(A)** |
| Gerson  Fox,<br><br>Plaintiff(s),<br>    v.<br><br>Michael Joel Kamen.<br><br>Defendant(s). | Date:    June 25, 2019<br>Time:    10:00 AM<br>Courtroom:  1539 |

Debtor Michael Joel Kamen ("Kamen") filed a voluntary petition under chapter 11 of the Bankruptcy Code on March 19, 2012, commencing bankruptcy case number 2:12-bk-19793-BB (the "Case").  Kamen's former business partner and his wife, Gerson

-1-

and Gertrude Fox (jointly, the "Foxes"), commenced the above adversary proceeding (the "Action") against Kamen on June 18, 2012.  By the time the Action went to trial on June 25, 2019, only one claim for relief remained in the Action:  a claim under Bankruptcy Code section 727(a)(4)(A) to bar Kamen from obtaining a discharge on the ground that Kamen had "knowingly and fraudulently" made a false oath or account in connection with the Case.

For the reasons set forth below, the Court finds that Kamen, knowingly and fraudulently, made several false statements under oath in connection with facts that are material in the Case and that the Foxes are entitled to a judgment barring Kamen from receiving a discharge in the Case under Bankruptcy Code section 727(a)(4)(A).  A judgment to this effect will be entered concurrently herewith.

# I

# STATEMENT OF FACTS

Kamen filed his bankruptcy schedules (the "Schedules") and his Statement of Financial Affairs (the "SOFA") on April 17, 2012.[1]  Kamen was represented in connection with the preparation of these documents by competent bankruptcy counsel, Leslie Cohen Law, PC, whose employment was approved by order entered May 15, 2002 [Case Docket No. 71].  Kamen executed both the Schedules and the SOFA under penalty of perjury.

On October 23, 2012, the Court entered an order [Case Docket No. 235] granting the motion of creditor The Private Bank of California for appointment of a chapter 11 trustee in the Case. The United States Trustee selected Richard Laski ("Laski") to serve as chapter 11 trustee in the Case.  The Case was converted to a case under chapter 7 of the Bankruptcy Code by order entered November 19, 2012 [Case Docket No. 274]. Laski conducted an examination of Kamen under oath at a meeting of creditors under Bankruptcy Code section 341(a) held January 2, 2013 (the "341(a) Meeting").

---

[1] The Schedules and the SOFA appear on the docket in the Case as Docket No. 35.

-2-

In the Joint Pretrial Order entered April 9, 2019 [Action Docket No. 205], the parties stipulated to the following additional facts, among others:

1. In or about early 2011, Kamen asked an old friend Mel Kaftan ("Kaftan") to open a bank account in Kaftan's name for the benefit of Kamen (the "Kaftan/Kamen Account");[2]
2. Kamen advised Kaftan that the proceeds from the sale of "his artwork and other items" would be deposited into the Kaftan/Kamen Account to be used by Kaftan for the benefit of Kamen;[3]
3. Kaftan testified that he only wrote checks from the Kaftan/Kamen Account at the instruction of Kamen or someone working for Kamen;[4]
4. Kamen continued to instruct Kaftan to disburse money to Kamen after the bankruptcy filing;[5]
5. Funds deposited into the Kaftan/Kamen Account came from sales of Kamen's artwork and [in April of 2011], from the proceeds of a sale of a condominium that Kamen had owned in Vancouver;[6]
6. All of the funds paid to Kamen by Kaftan prior to January 7, 2014 were from proceeds generated by sales of Kamen's artwork or his condominium — Kaftan did not make any loans or gifts of money to Kamen at any time prior to January 7, 2014;[7] and
7. At the time Laski learned of the existence of the Kaftan/Kamen account, [sometime prior to December 30, 2013], $78,287.15 remained in the account.[8]

---

[2] Joint Pretrial Order, p. 4, par. 33. See also Transcript of Kaftan Deposition, Plaintiff's Trial Exhibit 7, at pp. 30-31.
[3] Joint Pretrial Order, p. 4, par. 34.
[4] Joint Pretrial Order, p. 4, par. 35.
[5] Joint Pretrial Order, p. 4, par. 38.
[6] Joint Pretrial Order, p. 4, pars. 37 & 39.
[7] Joint Pretrial Order, p. 4, par. 44.
[8] Joint Pretrial Order, p. 4, par. 40.

There is no dispute, and this Court has previously found,[9] that Kamen's Schedules and SOFA are in inaccurate in several respects and that Kamen gave false testimony at his 341(a) Meeting. More specifically, the Schedules are inaccurate in that they, among other things, significantly undervalue Kamen's furnishings and artwork and do not disclose:

    a. the existence of the Kaftan/Kamen Account or any other bank account held by Kaftan for the benefit of Kamen that contained property of the estate;

    b. Kamen's collectible posters;

    c. artwork stored at 2404 Wilshire Boulevard;

    d. the sale of a condominium unit in Vancouver within two years preceding the bankruptcy filing;

    e. sales of posters within the two years preceding the bankruptcy filing.[10]

Kamen gave false testimony under oath at his 341(a) Meeting on at least the following issues:

    a. Kamen testified that the $15,000 to $18,000 that he was receiving from Kaftan per month was a gift, that there was no other reason that Kaftan was giving him money and that he hadn't given anything to Kaftan, when in fact the money that Kamen admitted he had "parked"[11] with Kaftan represented a portion of the proceeds from a January 2011 sale of his

---

[9] <u>Order Granting in Part and Denying in Part Motion for Partial Summary Adjudication of Issues</u>, Action Docket No. 196, p. 2, par. 4.

[10] Kamen claimed at trial that he never amended his Schedules or SOFA to correct these inaccuracies because, after a chapter 11 trustee was appointed, he was no longer represented by counsel in the Case. [The docket in the Case reflects that, on November 12, 2012, he filed a substitution of attorney, substituting himself, in propia persona, for Ms. Cohen in both the Case and the Action.] Thereafter, he retained replacement counsel to represent him in the Action. Why didn't he amend his schedules to ensure their accuracy before Ms. Cohen resigned or seek assistance from the Court's self-help center or from replacement counsel in filing amended schedules at any time thereafter? This action was filed in August of 2012 -- more than two months before Ms. Cohen resigned and almost 6 years before this matter went to trial. Yet Kamen did not take the steps necessary to correct the false oaths on his Schedules and his SOFA at any time during this 6-year period.

[11] At trial, as a way of explaining why he did not consider the money that he had given to Kaftan to have been transferred to him, Kamen explained that he had not transferred ownership of the money to Kaftan, He had merely "parked" the funds with him so that he would have access to them and his creditors would not.

Vancouver condominium and the proceeds of sales of collectible posters that occurred both within the two years preceding the commencement of the Case and after the Case was filed:

> [By Mr. Guess, Trustee's counsel] Q. . . . Why is he giving you money?
> A. He's my friend. It's my best friend and because I'm broke. If he didn't give me any money, I would have no income whatsoever.
> Q. How do you know Mr. Kaftan?
> A. Since high school, since – for about 55 years.
> Q. Have you ever done any business deals with Mr. Kaftan?
> A. No.
> Q. Have you ever given any money to Mr. Kaftan?
> A. Have I ever loaned him money or given him money?
> Q. A loan, a non-loan, anything. Have you ever given anything –
> A. Not that I know. When you say given, no.
> Q. Okay. So what do you mean?
> A. No. I'm saying that I don't think that I've ever given him any money –
> Q. Okay.
> A. –for anything. I mean, he's a wealthy guy, and he wouldn't have needed any money.
> Q. Okay. Have you ever transferred any property to Kaftan?
> A. No.
> [By Mr. Laski, trustee] Q. Does he have any of your vehicles?
> A. Huh?
> Q. Does he have any vehicles that you previously owned?
> A. He bought one car. He bought one car.

>    Q. Which vehicle is that?
>
>    A. The Audi.
>
>    [By Mr. Guess] Q. Has he ever bought any other property from you? Has he ever bought anything else from you?
>
>    A. No.
>
>    Q. I mean, I'll be candid. I have a really hard time, even if he's your best friend for 55 years, understanding why he's giving you 15 to 18 thousand dollars a month. Is there – is this a loan? Did he – are you going to pay him back?
>
>    A. It's a gift. He's put together I think a group of guys, and they've been funding it. That's my understanding.[12]

b. Kamen testified that he had no personal property located anywhere other than at 2404 Wilshire, his apartment and Ortiz Brothers Storage, when in fact he had delivered collectible posters to an auction house to be sold:

>    Q. . . . Other than at 2404 Wilshire and other than with Ortiz Brothers Storage and other than at your apartment, do you have any physical property located anywhere?
>
>    A. No.[13]

c. Kamen testified that he sold his condo in Vancouver prior to January of 2010,[14] when in fact the documentation introduced at trial showed that the sale closed in January of 2011;[15] and

d. Kamen testified that he had not sold any art since the beginning of 2010 and had not given any art to anyone since the beginning of 2010,[16] when

---

[12] Testimony from 341(a) Meeting, Plaintiff's Trial Exhibit 3, at pp. 37-38.
[13] Plaintiff's Trial Exhibit 3, at pp. 5-6.
[14] Plaintiff's Trial Exhibit 3, at p. 24.
[15] Plaintiff's Trial Exhibit 8.
[16] Plaintiff's Trial Exhibit 3, at p. 58. Although Kamen's direct testimony trial declaration, Action docket no. 216, specifically states that he did not personally sell "any artwork such as posters," Kamen's counsel attempted to ask Kamen leading questions at the time of trial designed to elicit testimony to the effect that Kamen had not disclosed the existence or value of his collectible posters, or the substantial amount of proceeds generated by sales thereof, in response to questions about "artwork" because he did not consider his posters to be "artwork." The court does not

    in fact, as Kamen admitted at trial, there had been sales of his collectible posters both within the two years preceding the bankruptcy filing and post-petition.[17]

 On March 5, 2019, the Court entered its "Order Granting in Part and Denying in Part Motion for Partial Summary Adjudication of Plaintiff's Second Amended Complaint" [Action Docket No. 196], summarily adjudicating that Kamen had made false oaths related to material facts in the Case.  The only factual issue that remained at the time of trial was whether these material misrepresentations had been made "knowingly and fraudulently" as required by section 727(a)(4)(A).  Based on the evidence and testimony introduced at trial, the Court finds that Kamen's misrepresentations were indeed knowing and fraudulent and, therefore, that Kamen should not receive a discharge in bankruptcy.

## II
## KAMEN MADE FALSE OATHS KNOWINGLY AND FRAUDULENTLY

 Bankruptcy Code section 727(a)(4)(A) provides that a chapter 7 debtor shall be granted a discharge unless "the debtor knowingly and fraudulently, in or in connection with the case — (A) made a false oath or account."  The oath must relate to a material fact, and the plaintiff must show both that the false oath was made knowingly and that it was made fraudulently.  "Knowingly" and "fraudulently" are two separate elements that must not be conflated.  In re Retz, 606 F.3d at 1197; Roberts v. Regard (In re Roberts), 331 B.R. 876, 882, 885 (Bankr. 9th Cir. 2005).

 To demonstrate that the defendant acted knowingly, the plaintiff must show that he made the false oath, "deliberately and consciously."  In re Roberts, supra, at 883-84.

---

find any testimony that Kamen's counsel may have attempted to elicit at trial to this effect to be credible, particularly in light of the fact that Kamen had never previously advanced this argument and did not include this argument in his direct testimony trial declaration.

[17] See also Plaintiff's Trial Exhibit 7, pp. 56-63.

To demonstrate that an oath was made fraudulently, the plaintiff must show that, at the time the oath was made, the defendant knew it was false and made the false oath with the intention and purpose of deceiving his creditors. In re Retz, 606 F.3d at 1198-99. "Intent is usually proven by circumstantial evidence or by inferences drawn from the debtor's conduct." Id. "Reckless indifference or disregard for the truth may be circumstantial evidence of intent, but is not sufficient, alone, to constitute fraudulent intent." Id. A debtor's fraudulent intent "may be established by inferences drawn from his or her course of conduct." In re Wills, 243 B.R. At 64.

On these facts, both those admitted by the parties, and those found by the Court at trial, the conclusion is inescapable that, in failing to disclose the existence of the Kaftan/Kamen Account and the source of the proceeds that went into that account, and in lying about the reason that he was receiving periodic disbursements from Kaftan, Kamen acted consciously and deliberately, with full knowledge of the falsity of his testimony and with the intent to deceive his creditors.

Either the monies that Kamen arranged to be paid to Kaftan from the sale of his condominium and his posters were transfers to Kaftan, or they were not. One or the other must necessarily be true. If these payments were transfers, they should have been disclosed on Kamen's SOFA, as they occurred within the two years preceding Kamen's bankruptcy filing, and Kamen should have acknowledged these transfers when questioned about them at his 341(a) Meeting. If they were not transfers, and Kamen merely asked Kaftan to hold these funds for Kamen's benefit, the funds still belonged to Kamen, were an asset of his bankruptcy estate and should have been disclosed on his Schedules.

Both Kamen and Kaftan testified that they considered the funds in the Kaftan/Kamen Account to belong to Kamen and that funds were only disbursed at Kamen's direction for his benefit. Kamen specifically testified that he "parked" these funds with Kamen so that he would have money to live on. Kamen was questioned at the 341(a) Meeting about whether he had given or transferred anything to Kaftan and

why Kaftan would be giving him money every month.  He knew full well why Kaftan was giving him money, but, instead of disclosing the fact that he had parked assets that belonged to his bankruptcy estate with Kaftan, Kamen lied about the reason for the payments and claimed that Kaftan was giving him money as a gift.  Kamen could not have been mistaken or confused about these facts.

The same is true with regard to Kamen's posters.  He "parked" them with an auction house prior to his bankruptcy filing, and the auction house sold posters during the two years before the bankruptcy filing and continued to sell them after the bankruptcy filing.  Kamen made arrangements for the proceeds of these sales to be deposited with Kaftan for his benefit.  Either Kamen "transferred" these posters to the auction house within the two years before the bankruptcy filing or he did not actually "transfer" them, he merely arranged for the auction house to hold them until they could be sold.  If these were transfers to the auction house, they should have been disclosed on Kamen's SOFA, and Kamen should have mentioned them when questioned about such transfers at his 341(a) Meeting.  If they were not actually transferred to the auction house, they remained an asset of Kamen's bankruptcy estate at the time of the filing and should have been disclosed on Kamen's schedules.

Kamen's counsel attempted to argue for the first time at trial that Kamen had not disclosed sales of these posters at his 341(a) Meeting because he did not consider them to be "artwork"; however, even if the Court were to accept this proposition as true,[18] it would not explain Kamen's failure to disclose the existence of any unsold posters.  On Schedule B, the fifth type of property described is "Books, pictures and other art objects; antiques; stamp, coin, record, tape, compact disc, and other collections or collectibles."  The thirty-fifth category of assets on Schedule B is "Other personal property of any kind not already listed."  Any posters that Kamen had not transferred to someone else by the time the bankruptcy case was filed should have

---

[18] In light of the fact that Kamen's trial declaration refers to his collectible posters as a type of "artwork," see supra, note 16, the Court does not find this proffered testimony to be credible.

been listed in one of these places. And in any event, sales of posters that occurred within the two years prior to the bankruptcy filing should have been disclosed on his SOFA as well — even if Kamen did not consider his posters to be "artwork."[19] However, Kamen disclosed neither the existence of these assets on his schedules nor any transfers of these assets on his SOFA or at his 341(a) Meeting.

In short, the Court rejects on credibility grounds Kamen's contention that he actually believed he was not under any obligation to disclose the existence of assets that still belonged to him that he had merely parked with someone else so that he would have money to live on later. Kamen could not possibly have believed that, by hiding an asset that still belongs to you with someone else, that asset will fall into some kind of alternate dimension in which it is neither something you own nor something you have transferred away and that you need not mention the existence of the asset on your schedules or testify accurately about it under oath at a meeting of creditors. These false statements were made deliberately and consciously and, therefore, "knowingly" within the meaning of the applicable caselaw.

And Kamen's testimony at the 341(a) Meeting, where he carefully avoids saying anything that might have tipped the trustee off as to the existence of the Kaftan/Kamen Account or the poster sales that had been continuing to produce funding for that account, demonstrates clearly the purpose for Kamen's false oaths and omissions — to deceive his creditors: to conceal the existence of these assets so that he would have something to live on after he filed bankruptcy. Therefore, these false oaths and omissions were made "fraudulently" within the meaning of the applicable caselaw.[20] As

---

[19] The amount of sales proceeds generated by these sales was not trivial. The evidence adduced at trial reflects that the net sales proceeds amounted to hundreds of thousands of dollars. See Plaintiff's Trial Exhibit 11.

[20] Kamen also testified falsely that the January 2011 sale of his Vancouver condominium had not occurred within two years prior to his bankruptcy filing. Kamen claimed that he had been trying to sell the condominium for so long that he thought it had been sold earlier. The Court does not find this testimony credible for at least two reasons: (1) if Kamen had been trying to sell the condominium for an extended period, finally accomplishing the sale would be that much more memorable; and (2) Kamen received a sizeable amount of proceeds ($446,215.98) and personally instructed his bank in April of 2011 to transfer from these proceeds more than $100,000 to ex-wife and more than $100,000 to the Kaftan/Kamen Account. His bankruptcy was filed approximately one year later. These transactions are sufficiently sizeable and recent to be memorable. Therefore, the Court finds that the failure to disclose the existence of this transfer was deliberate and conscious and therefore "knowing" within the meaning of section

all of the elements of section 727(a)(4)(A) have been satisfied, Kamen should not receive a discharge in bankruptcy.

### III

### CONCLUSION

A significant part of Kamen's defense at trial was his argument that he had cooperated fully with Laski and, therefore, could not have been trying to deceive or defraud his creditors when he made false oaths about his assets. When David Guess, counsel for Laski, was questioned at trial about the level of cooperation that he had received from Kamen, his responses were telling.

With the exception of Kamen's refusal to provide the trustee with a declaration at one point when asked to do so, and the false testimony that Kamen had given at his 341(a) Meeting, Guess agreed that, as far as Guess knew, Kamen had responded truthfully whenever Guess had asked him specific questions about an asset that the trustee had already discovered. But it was only through Guess's own diligent third-party discovery efforts that Laski had learned about the sale of Kamen's Vancouver condo, Kamen's ongoing sales of collectible posters and the existence of the Kaftan/Kamen Account.

Guess described the process of obtaining information from Kamen concerning assets of his bankruptcy estate as tantamount to playing the game of "Battleship"[21]— if

---

727(a)(4)(A). Further, as disclosing the existence of this transfer would have led the trustee to question where the proceeds went and might well have led to the discovery of the Kaftan/Kamen account, which Kamen was trying to conceal, the Court finds that the purpose of Kamen's failure to disclose this transfer was part of his fraudulent scheme to conceal the existence of the money he had "parked" with Kamen and was therefore "fraudulent" as well. Although Kamen also offered false testimony as to the value of his artwork and failed to disclose that he had a sizeable quantity of artwork stored at 2404 Wilshire, insufficient evidence was adduced at trial to demonstrate that these false oaths were made knowingly and fraudulently.

[21] According to the Wikipedia article on the subject, "Battleship" began as a pencil and paper game that dates back at least as far as World War I. It was published by various companies as a pad-and-pencil game in the 1930s and was released as a plastic board game by Milton Bradley in 1967. The game is played on four grids, two for each player. On one grid, the player arranges ships and records the shots by the opponent. On the other grid, the player records his own shots. Before play begins, each player secretly arranges his ships on his primary grid. After the ships have been positioned, the game proceeds in a series of rounds. In each round, each player takes a turn to announce a target square in the opponent's grid which is to be shot at. The opponent announces whether the shot was a hit or a miss. The attacking player notes the hit or miss on his own "tracking" grid with the appropriate color peg

the trustee managed to score a "hit" by asking Kamen exactly the right question about an asset that Kamen had been trying to hide, Kamen truthfully provided details in response to the question. Otherwise, that information was not provided — even when the omission resulted in Kamen's making false oaths on his Schedules or SOFA or at his 341(a) Meeting.

A discharge in bankruptcy is a powerful tool, created for the benefit of the honest, but unfortunate debtor, not for the benefit of a debtor who knowingly and fraudulently makes false oaths for the purpose of hiding assets from creditors. Kamen made material misstatements under oath about the existence of his assets, and these false statements were not inadvertent or accidental. They were knowing and fraudulent. Therefore, Kamen is not entitled to a discharge in bankruptcy. An order to this effect will be entered concurrently herewith.

###

Date: July 16, 2019

Sheri Bluebond
United States Bankruptcy Judge

---

(red for "hit;" white for "miss"), in order to build up a picture of the opponent's fleet. When all of the squares of a ship have been hit, the ship's owner announces the sinking of that ship. If all of a player's ships have been sunk, the game is over and the opponent wins.

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012* **F 9021-1.1.NOTICE.ENTERED.ORDER**